NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0725n.06
Filed: October 5, 2006

Nos. 03-4157, 03-4240, 05-3406

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ROBERT SEAN ROBERTS; KENNETH C. | ) | NORTHERN DISTRICT OF OHIO |
| STOVER, JR.; GARY J. HUDDLESTON, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before: MARTIN, MOORE, and ROGERS, Circuit Judges.

**ROGERS, Circuit Judge.** This is a consolidated, direct appeal from three criminal co-defendants' convictions for drug trafficking-related offenses. The co-defendants' sentences and convictions have no defect and we therefore affirm them.

I.

On September 10, 2002, a federal grand jury issued a superseding indictment charging Kenneth Stover, Robert Roberts, and Gary Huddleston with various crimes related to drug trafficking. The grand jury charged in Count 1 that "at least as early as the Fall of 2001, and continuing through June 4, 2002, the exact dates to the Grand Jury unknown," the co-defendants engaged in a conspiracy to distribute five or more kilograms of cocaine. A jury subsequently convicted them of many of the charges. The following convictions are relevant to this appeal.

Stover was convicted of conspiracy to distribute at least five kilograms of cocaine pursuant to 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846, and 851. Stover was also convicted of possession of a firearm in furtherance of a drug trafficking crime. Roberts was convicted of conspiracy to distribute or conspiracy to possess with intent to distribute at least five kilograms of cocaine. Huddleston was convicted of conspiracy to distribute at least 500 grams but less than five kilograms of cocaine. From late April to mid-May of 2003, the district court conducted a jury trial based on the charges in the superseding indictment. At trial the government called Federal Bureau of Investigation (FBI) Special Agent Michael Christman to testify. Christman led the investigation that resulted in the indictment of the co-defendants. Christman's FBI team discovered that one Scot Bailey had engaged in drug trafficking in the Cleveland, Ohio area. The FBI subsequently decided to identify Bailey's customers and suppliers. By doing so, the FBI hoped to trace the entire network back to its origin and to dismantle it. The FBI received judicial authorization to tap Bailey's cellular phone and did so.

As they listened to Bailey's phone conversations, FBI agents identified many of Bailey's customers and suppliers, including co-defendants Stover and Roberts, according to Christman's testimony. Armed with information from Bailey's phone conversations, the FBI subsequently received judicial authority to intercept the communications of Robert Roberts and Kenneth Stover. Christman testified that through these intercepted communications he "learned that Robert Roberts and Kenneth Stover were friends and associates as far as their drug trafficking activities [were concerned] . . . . And most importantly, it was learned that Kenneth Stover and Robert Roberts were

both being supplied with cocaine by Julio and Jorge Mercado." Julio and Jorge Mercado are brothers.

After obtaining judicial authority to do so, the agents then began monitoring the communications of the Mercado brothers. Christman testified that the FBI learned that the Mercado brothers maintained a network of family members and associates operating in Texas who helped distribute cocaine from its original source location, Matamoros, Mexico, where the cocaine was obtained from a cartel then operated by Osiel Cardenas Guillen. According to Christman, the FBI's monitoring of these communications revealed that the cocaine began with Guillen's group, was picked up by the Mercados' network, and finally was transported to co-defendants Stover and Roberts for "further distribution." At the same time that the FBI was monitoring these calls, it was also monitoring the calls of another Mercado associate, James Calhoun, who was supplying cocaine to co-defendant Gary Huddleston, according to Christman.

While monitoring these calls among these parties, according to Christman, the FBI team learned in advance that a shipment of cocaine of up to 36 kilograms would be transported from Brownsville, Texas to Cleveland, Ohio. The FBI decided to prevent the delivery from occurring and arrest the participants. The FBI succeeded in intercepting this shipment, which by Jorge's estimate included 21 kilograms of cocaine. Two of the intercepted 21 kilograms were meant for James Calhoun. The balance was intended for Stover, according to Jorge's trial testimony. The police arrested Julio Mercado, who was driving the shipment, according to Julio's trial testimony.

Following his arrest, Julio Mercado agreed to help the authorities generate evidence against Stover. On May 28, 2002, in a phone conversation recorded by the authorities and introduced into evidence, Julio offered Stover six kilograms of cocaine. Stover responded that, "I need, I need about ten of 'em," referring to ten kilograms of cocaine. Later that day, according to Julio's testimony, Stover met with Julio to pick up what he believed would be ten kilograms of cocaine. Julio gave Stover a bag and the FBI then arrested Stover.

At trial, the government called Jorge Mercado to testify. Jorge said that Stover had sought to obtain cocaine from the Mercado network. Jorge contacted a distributor named Jose Moreno, nicknamed Pepe, who provided a first shipment of "about six kilos, six kilograms of cocaine," according to Jorge's testimony. Jorge testified that he "sold them to Mr. Stover." The transaction took place at Stover's father's house. Jorge provided the cocaine on credit, and Stover later paid Jorge for the whole amount. Jorge later said that he could "not recall the exact amount" of cocaine purchased. On another occasion, Jorge arranged for a different distributor to sell seven kilograms of cocaine to Stover, to be shipped from Chicago, according to Jorge's testimony.

Jorge at other points in his testimony said that one of the cocaine shipments to Stover included less than five kilograms. Jorge spoke of a 2001 cocaine shipment from Pepe that ultimately went to Stover that included only four kilograms. A shipment sent to Stover in the same year, Jorge related, consisted of eighteen kilograms. Also in 2001, Jorge said that he had supplied Stover with fourteen to sixteen kilograms of cocaine, but Jorge was not sure of the exact amount.

In early 2002, Jorge testified, he received a cocaine shipment of about twenty kilograms. He said at trial that he distributed this entire quantity of drugs over a period shorter than one month to Stover and Roberts. During a later shipment, Stover paid up front for "most" of a shipment of "over 25 kilograms" transported by Jorge. Stover's take "[c]ould have been about 15" kilograms of cocaine, according to Jorge. Jorge kept a notebook to track the various amounts of cocaine that he had sold. Jorge testified that this notebook records that on one occasion Stover received from Jorge nine individually numbered kilograms of cocaine.

Regarding co-defendant Roberts, Jorge testified that his network sold to Roberts one kilogram of "bad" cocaine, for which Roberts paid $23,000 cash. Moreover, in relation to the aforementioned "over 25 kilograms" shipment of cocaine, of which Stover took "most," Roberts obtained "about three or four" kilograms, in Jorge's estimation. Jorge's notebook, also, records Roberts' receipt of three individually numbered kilograms. And a recorded telephone conversation in March of 2002 between Jorge and Roberts played at trial featured Roberts agreeing to accept four kilograms of cocaine. In a different phone conversation introduced at trial, the Mercado brothers discussed that Roberts had received four kilograms on one occasion. The estimate of four kilograms of cocaine for Roberts agrees with Jorge's statement to the FBI, given in July of 2002.

Jorge later increased his estimate of the drugs received by Roberts to a total of ten to fifteen kilograms of cocaine, but said that he could not be sure of exact quantities. During cross-examination, Jorge offered the following explanation for how his first estimate of three to four kilograms for Roberts later increased to ten to fifteen:

> To be honest with you, when I checked the phone calls, I saw the balance that he had on those four kilograms, okay? That made me go back and remember. . . . Because I wasn't—I wasn't going to give him four kilograms and then give him another four and just keep getting in debt with him. I gave him four kilograms. He started off paying fine and then he started getting in to debt. That's why I came out with those 10 kilograms.

Jorge conceded during cross-examination that it would be fitting to call his estimates "guesses." But immediately thereafter, Jorge referred to these "guesses" as "estimates."

The government subsequently called Julio Mercado to testify. Julio, like Jorge before him, testified that during a phone conversation he and Jorge discussed that Roberts was to receive four kilograms of cocaine. When testifying in his native language of Spanish later on, however, Julio said through an interpreter that Roberts had received five kilograms of cocaine. While examining an entry in some written records, Julio testified that Roberts had at one time received four kilograms of cocaine. Julio reiterated that the amount was four kilograms during cross-examination when defense counsel itemized the kilograms received by Roberts using the Mercado brothers' own notes. Julio also said that he never saw Stover carry a gun.

The government subsequently called to the stand another FBI agent, Warner Irizarry. Irizarry performed a search of Kenneth Stover and his residence and testified about what he found there. During the search, Irizarry photographed Stover's bedroom. There, Irizarry took pictures of Stover's dresser, and identified at trial "a box with a white powdery substance that was inside of one of those two drawers that was opened. Inside the box," Irizarry continued, "there was a pistol, laying inside the box with a powdery substance." In a different drawer, Irizarry photographed "a scale with a

white powdery substance on it, a hammer and a screwdriver." The FBI seized the pistol, which

Irizarry testified "was found to be loaded with bullets." The box, the scale, the bullets, and the gun

were introduced into evidence without objection.

James Calhoun, a member of the Mercado brothers' drug trafficking network, testified for

the government against co-defendant Gary Huddleston. Calhoun said that he met Huddleston

through a friend and thereafter began selling him cocaine. Between April and May of 2002, Calhoun

said, he received a total ten kilograms of cocaine, four of which he transferred to Huddleston.

The jury convicted Stover of conspiring to distribute five or more kilograms of cocaine, and

of possession of a firearm in furtherance of a drug offense. Regarding Stover's sentence, the district

court adopted the factual findings and guideline application in the presentence report. The report

observed:

> Kenneth Stover, Jr. conspired with Robert Roberts to obtain cocaine from Julio and
> Jorge Mercado. According to AUSA Ronald B. Bakeman, during the course of the
> conspiracy, Kenneth Stover, Jr. obtained, or it was reasonably foreseeable and jointly
> undertaken with Roberts, an amount of cocaine exceeding 25 kilograms. According
> to a July 17, 2003, telephone interview with SA Michael Christman (FBI), Kenneth
> Stover, Jr's involvement in this conspiracy consisted of 10 to 15 kilograms of
> cocaine, and Robert Roberts' involvement consisted of 6 to 10 kilograms of cocaine.
> . . . Because Kenneth Stover, Jr. has two prior [felony] convictions for drug law
> violations, the defendant's statutory penalty is mandatory life imprisonment, pursuant
> to 21 U.S.C. § 851 sentencing enhancements. At the time of his arrest, a search
> warrant of the defendant's home revealed that he possessed a small amount of
> cocaine, a scale, other drug paraphernalia, and a loaded gun.

The report also noted that, under United States Sentencing Guidelines § 5G1.1(b), the statutorily

required minimum sentence of life for Stover was greater than the maximum guideline range, and

therefore the statutorily required minimum serves as the Guidelines sentence for Stover. The district

court sentenced Stover to a mandatory term of life in prison without release.

Stover objected to the presentence report's increase in Stover's offense level by two levels

for obstructing justice, based on the report's conclusion that he lied to the jury. Stover made no other

objections to the presentence report.

The jury convicted Roberts of conspiracy to distribute five or more kilograms of cocaine.

Regarding Roberts' sentence, the district court adopted the factual findings and guideline application

in the presentence report. The report observed that Roberts had

> conspired with Kenneth Stover to obtain cocaine from Julio and Jorge Mercado. In
> this regard, the defendant [Roberts] did obtain or it was reasonably foreseeable and
> jointly undertaken with Stover an amount of cocaine exceeding 25 kilograms. . . .
> The defendant's role in the conspiracy included the supervision of at least Terrance
> Moore.

The district court sentenced Roberts to 240 months of imprisonment, and ten years of supervised

release, but waived any fine due to inability to pay. The presentence report set Roberts' criminal

history category at level IV, in part because Roberts' history included a prior felony drug offense.

Consequently, the report noted, statutory law required that Roberts be sentenced for his conspiracy

to distribute conviction to no less than 20 years in prison. *See* 21 U.S.C. § 841(b)(1)(A).

Roberts objected to some of the presentence report's findings. Roberts said that he had no

partnership with Stover, that the quantity of cocaine in the report was overstated, and that he had no supervisory role in the conspiracy.

The jury convicted Huddleston of conspiracy to distribute less than five kilograms but at least 500 grams of cocaine. The district court sentenced Huddleston to eight years of supervised release and 132 months of imprisonment (i.e., 11 years). In reaching this determination, the district court calculated two alternative sentences under the Guidelines, and then chose a point in between them, because it thought such a sentence was "appropriate and reasonable here." In calculating these two possible Guidelines sentences, the district court assumed two constants: (1) Huddleston's base offense level for his conviction was 30 because the quantity of cocaine at issue was "at least" four kilograms but less than five kilograms; and (2) Huddleston deserved a six-level reduction in his total offense level under Guidelines § 5K1.1 because of his assistance to the authorities.

In calculating the first possible Guidelines sentence, the district court used a criminal history category of IV, assuming that Huddleston was not a career offender. His total offense level would in that instance be 24. And his sentence range would be 77 to 96 months. The district court expressly stated at the sentencing hearing that this first possible sentence is "the appropriate guideline range."

The second possible sentence assumed that Huddleston was a career criminal with a criminal history category of VI and an enhanced offense level of 37. With the six-level reduction under § 5K1.1, Huddleston as a career criminal would have a total offense level of 31, rendering his

sentence range 188 to 235 months (i.e., 15.7 to 21.1 years).

The district court chose a sentence in between these two proposed ranges. "I have concluded," the district court said, "that a sentence of 132 months, which is the midpoint between the guideline sentence and the career offender sentence, is appropriate and reasonable here. And there is no magic to this." The district court justified its selection of this sentence by noting that "a sentence of 15 and a half years would be greater than necessary to meet the statutory purposes." But a "straight guidelines sentence, however, I don't think would be adequate to meet those statutory purposes." The district court noted that Huddleston had a past conviction for conspiracy to distribute cocaine that resulted in a 60 month sentence. That sentence "really should have convinced you [Huddleston] that isn't the way to go. Unfortunately, it didn't. So I think, in my view, a sentence that is reasonable needs to be substantially more than the five year sentence you got the first time."

Moreover, the district court noted that it had "reviewed very thoroughly" the presentence report, which examined Huddleston's background and the nature of his offense in detail. The district judged also noted that he had "presided over this trial so I'm very familiar with the facts of the case and the conduct of Mr. Huddleston."

Previously in the sentencing hearing, the district court had noted that "I'm required to look at 18 U.S.C. § 3553(A) and impose a sentence that is adequate but not harsher than necessary to effectuate all the statutory purposes of sentencing." The "touchstone of the sentence," the district court had observed, "is 18 U.S.C. Section 3553(A)."

- 10 -

**II.**

Regarding Stover's appeal, we affirm Stover's sentence of life in prison for conspiracy to distribute at least five kilograms of cocaine and his conviction for possession of a firearm in furtherance of a drug offense.[1] The trial testimony of Jorge Mercado, Stover's cocaine supplier, amply established that Stover conspired to distribute many more kilograms of cocaine than five. Moreover, contrary to the argument in Stover's brief, the amended version of 18 U.S.C. § 924(c) in effect at the time of Stover's offense makes it a crime to possess constructively a firearm in furtherance of a drug offense. *See United States v. Mackey*, 265 F.3d 457, 460-61 (6th Cir. 2001). There is no defect in Stover's conviction or sentence and both are consequently affirmed.

**A.**

Stover challenges his mandatory sentence of life in prison for conspiracy to distribute five or more kilograms of cocaine, but we affirm it. *See* 21 U.S.C. §§ 841(b)(1)(A) (setting forth life in prison as the required penalty for a two-time drug felon convicted under this subsection). In particular, Stover argues that the government did not present sufficient proof that his offense involved at least *five* kilograms of cocaine. The testimony of Stover's drug suppliers received at trial, however, amply supported the jury's finding that Stover's offense involved at least five kilograms of cocaine.

---

[1]Although Stover was sentenced before *United States v. Booker*, 543 U.S. 220 (2005), no *Booker* issue is implicated in Stover's case because he was sentenced pursuant to the statutory mandatory minimum sentence rather than pursuant to the United States Sentencing Guidelines.

We review Stover's challenge to his sentence under the sufficiency-of-the-evidence standard of review and the beyond-reasonable-doubt standard of proof. The rule of *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), requires that the drug quantity involved in Stover's offense be proved to a jury beyond a reasonable doubt because it resulted in a sentence, mandatory life, that exceeds the statutory maximum sentence that could have applied to Stover had no drug quantity been found. *See United States v. Zidell*, 323 F.3d 412, 428-29 (6th Cir. 2003).

Viewing the evidence in the light most favorable to the prosecution, a rational juror could have found beyond a reasonable doubt that Stover's offense involved far more than the required threshold of five kilograms needed to sustain his sentence. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (sufficiency of the evidence defined). The evidence compels affirmance because Jorge Mercado's testimony and the FBI sting operation assisted by Julio Mercado show that Stover's offense involved far more than five kilograms.

For example, Jorge testified that he sent eighteen kilograms of cocaine to Stover. Stover attempts to cast doubt on such testimony by implying that the evidence did not place these large shipments within the time period of the conspiracy alleged in the indictment. The indictment, however, does not rigidly define the conspiracy's time period. It left open the possibility that further evidence might clarify its beginning and ending points. The indictment says that "*at least* as early as the Fall of 2001, and continuing through June 4, 2002, the exact dates to the Grand Jury *unknown*" (emphasis added), the co-defendants participated in the conspiracy. Therefore, the indictment by its terms did not require the jury to disregard evidence of the conspiracy before the fall of 2001, or any

other time period.

Jorge explained that Stover received many other kilograms of cocaine. In 2001, Stover received fourteen to sixteen more kilograms of cocaine from the Mercados. Likewise, Jorge also testified that in early 2002 he received a cocaine shipment of about twenty kilograms and that Stover received "most" of it. Thus, Stover's share of this batch must have exceeded about ten kilograms, and it "[c]ould have been about 15" kilograms of cocaine, said Jorge. This evidence permitted the jury to accept Jorge's testimony and conclude that Stover possessed many more than five kilograms of cocaine in connection with the conspiracy.

Moreover, the FBI's sting operation that resulted in Stover's arrest strongly supports the jury finding of a cocaine quantity of at least five kilograms. On May 28, 2002, Stover demanded ten kilograms of cocaine from Julio over the telephone. Later that day, Stover met with Julio and accepted a bag from Julio that Stover doubtless thought contained ten kilograms of cocaine. This evidence, along with Jorge's testimony, amply sustains the verdict setting the cocaine quantity at five or more kilograms. Stover's sentence of life in prison without release for this offense is affirmed.

**B**.

We also affirm Stover's conviction for possession of a firearm because the amended version of 18 U.S.C. § 924(c) applicable to Stover's case criminalizes simple possession of a firearm in furtherance of a drug offense, contrary to Stover's contention in his brief.

Stover says in his brief that he is challenging the sufficiency of the evidence, but that is incorrect. Stover's brief argues that the evidence did not establish the "active employment" requirement laid down in *Bailey v. United States*, 516 U.S. 137 (1995). In other words, Stover argues that the prosecution proved the wrong set of elements when it advanced a theory of the crime based on simple possession of a firearm. That is better characterized as a legal argument, not a challenge to the sufficiency of the evidence.

It is a wrong legal argument. Section 924(c) defines two different crimes: (1) *use* of a firearm *during* and *in relation to* a drug offense; and (2) *possession* of a firearm in *furtherance* of a drug offense. *See United States v. Combs*, 369 F.3d 925, 930-33 (6th Cir. 2004). Count 124 of the indictment charged Stover with the latter, but the "active employment" requirement of *Bailey* applies only to the former. *See id.* at 932-33. Stover thus asks this court to mismatch the elements of these two crimes by requiring the government to prove *use in furtherance*, which § 924(c) does not recognize as a distinct crime. Stover's legal argument thus has no merit and his sentence is affirmed.

## III.

Roberts' sentence[2] is affirmed because his challenge to the jury's drug-quantity finding under the sufficiency-of-the-evidence standard, even if successful, would not reduce his sentence.

In his brief, Roberts argues that the jury's finding that his offense involved five or more

---

[2]Roberts' appeal, like Stover's, was filed and briefed before the *Booker* decision. We do not discuss potential *Booker* issues related to Roberts' appeal for the same reason we did not with respect to Stover's appeal. *See supra* note 1.

kilograms of cocaine must be overturned under the sufficiency-of-the evidence standard. *See Jackson*, 443 U.S. at 319. But this argument cannot justify a reduction in Roberts' sentence because even if the jury had made no drug-quantity finding at all, Roberts' sentence would remain valid. The district court sentenced Roberts to 20 years in prison pursuant to its finding that his offense involved 25 kilograms of cocaine. The default statutory maximum sentence (i.e., the maximum sentence absent any drug-quantity finding) for Roberts' offense is 30 years in prison, owing to his conviction of at least one prior drug felony. *See* 21 U.S.C. § 841(b)(1)(C). The district court was therefore free to sentence Roberts, based on its own drug-quantity finding by a preponderance of the evidence, for a prison term of up to 30 years without any input from the jury on the issue of drug quantity. *See Zidell*, 323 F.3d at 428-29. Overturning the jury's finding of drug quantity would not justify reducing Roberts' sentence. Roberts' challenge to the jury's drug-quantity finding is consequently pointless.

Therefore, Roberts was properly sentenced.

## IV.

Huddleston's sentence is affirmed because the district court committed no violation of the Sixth Amendment, committed no harmful error in its factual findings, reasonably sentenced Huddleston above the applicable Guidelines range after considering the 18 U.S.C. § 3553(a) factors, and did not improperly use the appellate reasonableness standard to determine Huddleston's sentence.

Huddleston in his brief marshals four arguments against his sentence, none of which have merit. These arguments are: the district court (a) violated the Sixth Amendment when it found that Huddleston was involved in distributing at least four kilograms of cocaine, because that allegation was never submitted to a jury; (b) made a finding of "at least" four kilograms in this regard that was clearly erroneous; (c) sentenced Huddleston unreasonably by failing to articulate properly the § 3553(a) basis for exceeding the applicable Guidelines range; and (d) applied the appellate scope of review rather than the proper standard of proof to determine Huddleston's sentence. These arguments have no merit.

**A.**

The district court did not violate the Sixth Amendment by finding at sentencing that Huddleston's offense involved at least four kilograms of cocaine, and using that finding to increase Huddleston's total offense level under Guidelines § 2D1.1(c)(5).

The jury found that Huddleston's offense involved at least 500 grams but less than five kilograms of cocaine. The district court put the quantity at "at least" four kilograms based on its own assessment of the evidence, and relied on this finding during sentencing to set Huddleston's offense level at 30. Huddleston in his brief argues that the district court violated the Sixth Amendment principles announced in *Apprendi* and *United States v. Booker*, 543 U.S. 220 (2005), when it did this.

The district court's actions did not violate *Apprendi* because the jury found that Huddleston's offense involved at least 500 grams of cocaine but less than five kilograms. The district court's

finding of "at least" four kilograms, then, could not possibly have increased the *statutory* maximum authorized by this verdict, as is forbidden by *Apprendi*, 530 U.S. at 490, as the district court's finding is within the range defined by the verdict. Huddleston's sentence has no *Apprendi* defect.

Huddleston's sentence has no *Booker* defect either. The constitutional defect cured in the remedial portion in *Booker* was this: the Guidelines were mandatory. *See* 543 U.S. at 245-46. Absent their formerly mandatory nature, the Guidelines have no constitutional defect, as evidenced by the Supreme Court's severance and invalidation of only the statutory provisions related to the Guidelines' mandatory nature. *See id.* So long as district courts treat the Guidelines as advisory, they may find facts that increase a sentence within a statutory range of penalties defined by the jury verdict. *See id.* at 233.

In this case, the district court understood that the Guidelines are advisory and treated them as advisory. The district judge said at the sentencing hearing, for instance, "I have to determine what the advisory range is." "And of course these are all advisory." "In some ways sentencing . . . is more difficult now after the *Booker* and *Fanfan* decisions because the Court has discretion . . . ." The district court therefore committed no Sixth Amendment error under *Booker* when it considered the Guidelines' advice and found a cocaine quantity that increased Huddleston's sentence within the statutory range of penalties defined by the verdict.

**B.**

Regarding Huddleston's argument that the district court clearly erred in its cocaine quantity

finding, the error that Huddleston alleges is harmless because the district court selected an offense level consistent with a finding of *exactly* four kilograms—an amount that Huddleston concedes could have been properly found.

The district court found that Huddleston's offense involved "at least" four kilograms of cocaine. On this basis the district court calculated Huddleston's offense level as 30, corresponding to a drug quantity of at least 3.5 kilograms but less than five kilograms of cocaine. *See* U.S.S.G. § 2D1.1(c)(5). Huddleston in his brief admits that the evidence permits the inference that he "acquired *precisely* four kilograms in the course of the conspiracy" (emphasis added). Accepting that as true, Huddleston's base offense level in that case would *still* be 30 under § 2D1.1(c)(5). Consequently, any error in the district court's use of the phrase "at least" four kilograms, rather than four kilograms "precisely," was harmless and must be ignored. *See* 28 U.S.C. § 2111; Fed. R. Crim. P. 52(a).

## C.

The district court properly analyzed the 18 U.S.C. § 3553(a) factors, including the applicable Guidelines range, and imposed a reasonable sentence. A sentence survives appellate reasonableness review when the district court calculates the applicable Guidelines range for the defendant's offense, *see United States v. Stone*, 432 F.3d 651, 655 (6th Cir. 2005), considers the applicable Guidelines range as an "ingredient" in the "mix" of § 3553(a) factors, and weighs all such factors "in their totality." *See United States v. McBride*, 434 F.3d 470, 476-77 (6th Cir. 2006). We review these determinations for reasonableness. *See United States v. Webb*, 403 F.3d 373, 383 (2005).

The district court's sentence was reasonable. *First*, it calculated a Guidelines range of 77 to 96 months. Huddleston in his brief does not expressly challenge that determination.

*Second*, the district court evaluated whether the applicable Guidelines range was appropriate in light of the § 3553(a) factors. At various points during the sentencing hearing, the district court expressly mentioned that it was considering or must consider the § 3553(a) factors. The district court examined "the nature and circumstances of the offense and the history and characteristics of the defendant." § 3553(a)(1). The district court noted that it had "reviewed very thoroughly" the presentence report, which examined Huddleston's background and the nature of his offense in detail. The district judge also reminded counsel that he had "presided over this trial so I'm very familiar with the facts of the case and the conduct of Mr. Huddleston." The district court also pointed out that the defendant had conspired to distribute at least four kilograms of cocaine, and discussed Huddleston's past conviction for assault with the government's counsel. The district court demonstrated its consideration of the offense and Huddleston's history in accordance with § 3553(a)(1).

The district court also considered "the need for the sentence imposed." § 3553(a)(2). The district court rejected the much longer career criminal sentence range advocated by the government because it was "greater than necessary," § 3553(a), to "reflect the seriousness of the offense," § 3553(a)(2)(A), "to afford adequate deterrence," § 3553(a)(2)(B), and "to protect the public," § 3553(a)(2)(C). But in light of Huddleston's recidivism, it found the applicable Guidelines sentence too short, as a previous five-year sentence had failed to deter Huddleston from re-committing this

crime. § 3553(a)(2)(B) (recognizing deterrence of criminal conduct as a sentencing consideration).

The district court also considered "the kinds of sentences available." § 3553(a)(3). As mentioned above, the district court considered and rejected a far harsher alternative sentence, based on the government's claim that Huddleston should be treated as a career offender. Although the district court did not expressly reason through each and every sub-factor in open court, it discussed the factors most relevant to the case before it and thereby provided "sufficient information with regard to the sentence to permit a reasonableness review." *McBride*, 434 F.3d at 478. There is no merit to Huddleston's suggestion in his brief that the district court inadequately explained the "factors considered and reasoning employed."

## D.

Finally, the district court did not improperly substitute the appellate reasonableness scope of review for the proper standard of proof in determining Huddleston's sentence, as Huddleston alleges in his brief. The district court referred to its sentence as "reasonable" at the sentencing hearing. Huddleston in effect argues that the use of the word "reasonable" here proves that the district court applied the appellate reasonableness standard instead of considering the § 3553(a) factors.

But as noted above, the district court did consider the § 3553(a) factors. The district court's use of the word "reasonable" does not require the conclusion that the district court used the appellate reasonableness standard. There is no merit to Huddleston's claim that the district court sentenced him pursuant to the appellate reasonableness standard.

**V.**

For the foregoing reasons, the sentences and conviction are affirmed.